UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

**RUTH PARKER, o/b/o B.P.,**

     **Plaintiff,**

v.

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

No. 06-CV-711
(GLS/GJD)

---

**APPEARANCES:**

**FOR THE PLAINTIFF:**

Conboy, McKay, Bachman & Kendall, LLP
407 Sherman Street
Watertown, NY 13601

**FOR THE DEFENDANT:**

Social Security Administration
Office of Regional General Counsel - Region II
26 Federal Plaza - Room 3904
New York, NY 10278

**OF COUNSEL:**

LAWRENCE D. HASSELER, ESQ.

JENNIFER S. ROSA, ESQ.
KAREN M. ORTIZ, ESQ.
Special Assistant U.S. Attorneys

**Gary L. Sharpe**
**U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

In this action, Plaintiff Ruth Parker, on behalf of her minor child, BP, moves, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for a review of a decision by the Commissioner of Social Security denying BP's application for childhood disability benefits. Based upon the following discussion, this Court finds that the ALJ erred by failing to discuss specifically whether BP's condition met or medically equaled Listing 112.05E. Therefore, the matter must be reversed and remanded.

## II. Procedural History

On January 23, 2004, Parker protectively filed for Supplemental Security Income ("SSI") benefits on behalf of BP, her minor child. (Tr. 28, 42, 55).[1] BP was five-years old at the time the application was filed. (Tr. 42). The application was denied initially. (Tr. 28-32). A request was made for a hearing. (Tr. 33). A hearing was held before an Administrative Law Judge ("ALJ") on August 25, 2005. (Tr. 204-16). BP was six-years old at the time of the hearing. (Tr. 206). In a decision dated December 23, 2005, the ALJ found that BP is not disabled. (Tr. 12-23). The Appeals Council denied Parker's request for review on April 28, 2006. (Tr. 5-7). Parker commenced this action on June 8, 2006 pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner's final decision. Dkt. No. 1.

## III. Contentions

Parker contends that the Commissioner's decision is not supported by substantial evidence. She claims that BP's impairments meet or equal one of the listed impairments. Dkt. No. 6. She also claims that the ALJ erred in evaluating BP's limitations in three of the functional equivalence domains. *Id.* The Commissioner counters that substantial evidence supports the ALJ's decision that BP is not disabled. Dkt. No. 12.

## IV. Facts

### A. Medical Records

#### 1. Hepburn Health Center

From January 2, 2002 to February 3, 2004, BP received treatment at Hepburn Health Center. (Tr. 100-12). BP was treated for colds and referred for dental treatment due to dental abscesses. (Tr. 110). It was noted on September 30, 2003 that Parker

---

[1] "(Tr.)" refers to the page of the Administrative Transcript in this case. Dkt. No. 5.

stated that BP showed aggression and self-harming behaviors. (Tr. 104). Rita Crowley, N.P. noted that she attempted to contact BP's teacher and that she discussed with Parker that the "social upheaval" occurring at BP's home "could be contributing to [BP'S behavioral] problems." (Tr. 104-05).

### 2. Stanley Charlamb, M.D.

On April 7, 2004, BP underwent an opthalmology consultation by Stanley Charlamb, M.D. (Tr. 114-18). Dr. Charlamb diagnosed BP as suffering from intermittent esotropia. (Tr. 117).

### 3. State Agency Review Physicians

State agency review physicians, Deborah Bostic, M.D. and Joseph Dambrochia, Ph. D., completed a Childhood Disability Evaluation Form on April 30, 2004 and May 4, 2004, respectively. (Tr. 119-25). It was indicated that BP's impairment or combination of impairments is severe, but does not meet, medically equal or functionally equal a listed impairment. (Tr. 119). Regarding the functional equivalence domains, it was noted that BP exhibits no limitation in the domains of moving about and manipulating objects, caring for yourself, and health and physical well-being; a less than marked limitation in the domains of acquiring and using information, and attending and completing tasks; and a marked limitation in the domain of interacting and relating with others. (Tr. 121-22).

### 4. Donald Schuessler, Jr., M.D.

From October 2, 2003 to October 7, 2005, BP was treated by Donald Schuessler, Jr., M.D., a pediatrician. (Tr. 126-35, 146-52, 180-81). Dr. Schuessler diagnosed BP as suffering from Attention-Deficit/Hyperactivity Disorder ("ADHD"), Oppositional Defiant Disorder ("ODD"), "sleep problems," and social difficulties. (Tr. 129). BP was prescribed various medications. (Tr. 180). On October 7, 2005, Dr. Schuessler recommended that a

"[v]igorous behavior mod[ification] approach" should be pursued. (Tr. 181).

On February 20, 2004, Dr. Schuessler completed a questionnaire in which he noted that BP's current symptoms include "many behavioral problems. Limited ability for family to deal with child. Improved functioning when he takes his medication (Ritalin[;]) apparently does reasonably well at school on med[ications]." *Id.* Dr. Schuessler indicated that BP exhibited age-appropriate functioning in the following areas: fine/gross motor skills, sensory abilities, communication skills, and cognitive skills. (Tr. 130).

### 5. Thomas Bersani, M.D.

On May 17, 2004, BP was examined by Thomas Bersani, M.D., an eye surgeon. (Tr. 137). Dr. Bersani diagnosed BP as suffering from bilateral upper eyelid congenital ptosis. *Id.* On June 21, 2004, Dr. Bersani performed a bilateral upper lid ptosis repair. (Tr. 139).

### B. School Records

### 1. 2003-2004 School Year

In a progress report dated October 2003, BP's kindergarten teacher, "Mrs. Roberts," noted that BP needs improvement in his abilities to listen, follow directions, and seek help as needed. (Tr. 76, 201). She also noted that BP does not yet communicate clearly, but often participates willingly and has adjusted some to the class. *Id.* Mrs. Roberts expressed concern that the academic program is too difficult for BP. *Id.*

During October of 2003, BP underwent a psycho-educational evaluation by Karen Geer, a school psychologist. (Tr. 82-86, 182-87). During a classroom observation, BP exhibited no behavior problems. (Tr. 86, 186). IQ testing revealed varying results. *Id.* One test showed a full scale IQ score of 68 while another test showed a composite IQ test score of 105. *Id.* Dr. Geer noted that the "unusual" difference "could be related to

4

attentional problems, medication, or vision" or the difference could be due to "poor visual motor skills." *Id.* Dr. Geer found that it "is too early in [BP's] academic career to classify him with a learning disability." *Id.* Dr. Geer found that BP did not qualify for Special Education services unless a speech therapist found that BP's speech and language skills are impaired. (Tr. 86).

In a November 2003 report card, Mrs. Roberts indicated that BP needs improvement in, *inter alia*, the areas of reading, listening and speaking, and writing. (Tr. 160-61, 192-93). She commented to Parker, "Academically it is a struggle for [BP]. We need to discuss future options. Social skills are also weak." (Tr. 162, 194).

On December 11, 2003, BP underwent a speech/language evaluation. (Tr. 81, 174, 187). He exhibited an overall slight language delay. *Id.* However, the delay was found to have no significant impact on his academic performance. *Id.* No speech/ language services were recommended, but it was noted that BP's language skills should be monitored. *Id.*

In a December 2003 progress report, Mrs. Roberts indicated that BP is improving in his abilities to listen, follow directions, communicate clearly, and print his name, and in his small motor skills. (Tr. 168, 200). She also noted that BP is showing involvement in language activities. *Id.* Mrs. Roberts indicated that a parent-teacher conference is not needed. *Id.*

On January 5, 2004, BP was withdrawn from school. (Tr. 75). However, BP returned on March 5, 2004. (Tr. 93). Mrs. Roberts noted that BP was going to be repeating kindergarten. *Id.* She also noted that BP showed an unusual degree of absenteeism, pointing out that as of March 12, 2004, BP missed thirty-three days of school. *Id.* She indicated that BP has problems functioning in the following domains:

5

acquiring and using information, attending and completing tasks, interacting and relating with others; moving about and manipulating objects; and caring for himself. (Tr. 94-98). She noted that BP does not work independently and that he receives "AIS" help. (Tr. 94).

### 2. 2004-2005 School Year

In November of 2004, BP was evaluated for occupational therapy services. (Tr. 156-58, 188-90). It was recommended that BP receive services in order to facilitate improvements in visual/fine motor strength, coordination, and visual perception skills. (Tr. 157, 189).

In a November 2004 report card, Mrs. Roberts noted that BP's skills in the areas of reading, listening and speaking, writing, and approaches to learning are mostly "age appropriate." (Tr. 163-65). Mrs. Roberts stated that BP "counted to number 2. Should be able to count to 10 at this time." (Tr. 166, 198). She also noted an improvement in BP's ability to print his name. *Id.*

### 3. 2005-2006 School Year

A report dated October 7, 2005 that was completed by BP's first-grade teacher, Mrs. Kim Johnson, states that BP "works hard and is a very cooperate classmate." (Tr. 154, 179). However, BP's "alphabet and number skills are very weak, as well as his fine motor skills." *Id.* Mrs. Johnson stated that BP was working with an "AIS teacher." *Id.* She also stated that she was "very concerned about his skill levels" and wished to discuss BP's "situation" with Parker.

## V. Discussion

### A. Standard of Review

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence

supports the Commissioner's findings and that the correct legal standards have been applied. *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g). Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson*, 817 F.2d at 986.

## B. <u>Determination of Childhood Disability</u>

In 1996, Congress significantly altered the childhood disability terrain, for purposes of eligibility for SSI benefits under the Social Security Act, by enacting the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996).[2] In accordance with the PRWORA, which took effect on August 22, 1996, an individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he or she

---

[2] Entitlement to SSI benefits is governed by a federal program intended to provide benefits to needy aged, blind, or disabled individuals who meet certain statutory income and resource limitations. 42 U.S.C. § 1381; *see Schweiker v. Wilson*, 450 U.S. 221, 223, 101 S. Ct. 1074, 1077 (1981).

> has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i). That definitional provision goes on to exclude from coverage any "individual under the age of 18 who engages in substantial gainful activity. . . ." 42 U.S.C. § 1382c(a)(3)(C)(ii). By regulation, the agency has prescribed a three-step evaluative process to be employed in determining whether a child can meet the statutory definition of disability. 20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*, 02 Civ. 3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003). The first step of the test, which bears some similarity to the familiar, five-step analysis employed in adult disability cases, requires a determination of whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488. If so, then both statutorily and by regulation the child is ineligible for SSI benefits. 42 U.S.C. § 1382c(a)(3)(c)(ii); 20 C.F.R. § 416.924(b).

If the claimant has not engaged in substantial gainful activity, then the second step requires examination of whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are severe – that is, which causes more than a minimal functional limitation. 20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If the existence of a severe impairment is discerned, the agency must next determine whether it meets or equals a presumptively disabling condition identified in the listing of impairments set forth by regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "listings"). *Id.* Equivalence to a listing can be either medical or functional. 20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability, and the twelve-month durational requirement is satisfied,

the claimant will be deemed disabled.  20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

Under final regulations which became effective on January 2, 2001, and materially altered the test dictated under the superceded interim rules, *see Kittles*, 245 F. Supp. 2d at 488-89, analysis of functionality is informed by consideration of how a claimant functions in six areas which are denominated as "domains," and described as "broad areas of functioning intended to capture all of what a child can or cannot do."  20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. Those prescribed domains include:

> (i) [a]cquiring and using information;
> (ii) [a]ttending and completing tasks;
> (iii) [i]nteracting and relating with others;
> (iv) [m]oving about and manipulating objects;
> (v) [c]aring for [oneself]; and
> (vii) [h]ealth and physical well-being.

20 C.F.R. § 416.926a(b)(1).  A finding of disability is warranted if a "marked" limitation, defined as when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(2)(i), is found in two of the listed domains.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.  Functional equivalence also exists in the event of a finding of an "extreme" limitation, meaning "more than marked," representing an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(3)(i), in one domain.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.

### C.  <u>ALJ Brown's Decision</u>

Using the three-step disability evaluation, ALJ Brown found that 1) BP has not engaged in any substantial gainful activity since the alleged onset disability date; 2) BP's ADHD is a severe impairment; and 3) The severe impairment fails to meet or medically

9

equal any of the listed, presumptively disabling conditions set forth in Appendix 1 of the Regulations. (Tr. 15-23). The ALJ evaluated BP's functional abilities in the six domains established by 20 C.F.R. § 416.926a(b)(1) and found that BP has marked limitations in the domain of interacting and relating with others; less than marked limitations in the domains of acquiring and using information, and attending and completing tasks; and no limitations in the domains of moving about and manipulating objects, caring for himself, and health and physical well-being. (Tr. 20-22). The ALJ consequently concluded that BP is not disabled. (Tr. 22).

### D. Listing 112.05

Parker argues that BP's condition meets the requirements of Listing 112.05E because BP exhibited a full-scale IQ score of 68 and because BP meets paragraphs B2b and B2d of Listing 112.02. Dkt. No. 6 at 19-24. Defendant argues that the IQ score is "not a fully accurate assessment of BP's cognitive ability" because a different IQ test revealed an IQ of 105. Dkt. No. 12 at 20.

The relevant listing provides as follows:

112.05 Mental Retardation: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning. The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.

E. A valid verbal, performance, or full scale IQ of 60 through 70 and:

    2. For children (age 3 to attainment of age 18), resulting in at least one of paragraphs B2b or B2c or B2d of 112.02.[3]

---

[3] The relevant paragraphs of 112.02B (Organic Mental Disorders) provide as follows:

2. For children (age 3 to attainment of age 18), resulting in at least two of the following:

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

10

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.05.

In his decision, the ALJ noted that BP achieved a full-scale score of 68, placing BP in the borderline range of intelligence. (Tr. 18). The ALJ concluded that BP "did not meet the requirements for any mental disorder listings." (Tr. 17). The ALJ provided no further discussion regarding BP's IQ.

The Second Circuit instructs that in cases in which the disability claim is premised upon one or more listed impairments of Appendix 1, the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment. *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982); *see also Hendricks v. Commissioner of Social Security*, 452 F. Supp.2d 194, 198-99 (W.D.N.Y. 2006).

The ALJ noted that BP's IQ score of 68 placed BP in the borderline range of intelligence. (Tr. 18). However, the ALJ failed to discuss specifically BP's different IQ scores and whether BP's condition met or medically equaled Listing 112.05E. In light of the ALJ's failure to provide a sufficient rationale, the Court is unable to conclude that the ALJ's finding that BP fails to meet or medically equal a listed impairment is supported by substantial evidence. Accordingly, the matter must be remanded.

### E.  Functional Domains

### 1.  Acquiring and Using Information

Parker argues that the ALJ erred by failing to find a marked limitation in the domain

---

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.02B.

11

of acquiring and using information.  Dkt. No. 6 at 20-21.  Defendant argues that the record supports the ALJ's finding that BP has a less than marked limitation in this domain.  Dkt. No. 12 at 20-22.

The domain of acquiring and using information addresses how well a child learns information, and uses the information he or she has learned.  20 C.F.R. § 416.926a(g).

The ALJ found that BP has a less than marked limitation in the domain of acquiring and using information.  (Tr. 20).  For the following reasons, the ALJ's finding is supported by substantial evidence.

First, BP's school records support the ALJ's finding.  For instance, in a November 2003 report card, Mrs. Roberts stated that BP is "struggling" academically.  (Tr. 162, 191).  However in a December 2003 progress report, Mrs. Roberts indicated that BP is improving in his abilities to listen, follow directions, communicate clearly, and print his name, and in his small motor skills.  (Tr. 168, 200).  She also noted that BP is showing involvement in language activities.  *Id.*  Mrs. Roberts indicated that a parent-teacher conference is not needed.  *Id.*

Moreover, in a November 2004 report card, Mrs. Roberts indicated that BP is mostly "age appropriate" in various skills in the reading, listening and speaking, writing, and "approaches to learning" categories.  (Tr. 164-65).  She also observed an improvement in BP's ability to print his name.  (Tr. 166).

Second, the ALJ's finding is supported by the report from Dr. Geer, a school psychologist.  Dr. Geer found that BP did not qualify for Special Education services unless a speech therapist found that BP's speech and language skills are impaired.  (Tr. 86).  A subsequent speech/language evaluation showed that BP has a slight language delay overall.  (Tr. 81).  However, it was recommended that BP receive no speech/language

12

services. *Id.*

Third, the progress notes from Dr. Schuessler, BP's treating pediatrician, also support the ALJ's decision. For instance, on November 11, 2003, Dr. Schuessler noted that Parker is "pleased" by the progress made by BP, who was taking Ritalin, and that Parker saw "good functioning" by BP. (Tr. 133).

On January 23, 2004, Dr. Schuessler noted that BP's ADHD is "apparently reasonably well controlled" when BP took Ritalin. (Tr. 132).

On February 20, 2004, Dr. Schuessler indicated in a questionnaire that BP's fine/gross motor skills, sensory abilities, communication skills, and cognitive skills are age-appropriate. (Tr. 130). He also noted that BP's functioning improves when he takes Ritalin. (Tr. 129).

On April 22, 2004, Dr. Schuessler noted that Parker reported a "dramatic improvement in [BP's] functioning with current med[ications]. All parties pleased. No change requested." (Tr. 127). Dr. Schuessler opined that BP is "doing reasonably well" with regard to his ADHD, ODD, and sleep problems. *Id.*

On December 21, 2004 Dr. Schuessler noted that BP, who was taking Clonidine, is "doing well." (Tr. 149).

On May 18, 2005, Dr. Schuessler noted that BP is taking Ritalin and Clonidine and is "apparent[ly] doing well at school." (Tr. 151). Dr. Schuessler commented that BP is "doing well" with regard to his ADHD, and that BP's sleep problems improved. *Id.*

On October 7, 2005, Dr. Schuessler commented that BP is "doing fairly well" with regard to his ADHD and sleep problems. (Tr. 181).

Fourth, the ALJ's finding is further supported by the opinions of Dr. Bostic and Dr. Dambrochia, State agency physicians, who indicated that BP has a less than marked

13

limitation in the domain of acquiring and using information. (Tr. 121). State agency physicians are "highly qualified physicians . . . who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(I); 416.927(f)(2)(i); SSR 96-6p, 1996 WL 362203, at *2 (S.S.A. July 2, 1996).

In light of the foregoing, the ALJ's determination in the domain of acquiring and using information is supported by substantial evidence.

### 2. **Attending and Completing Tasks**

Parker argues that the ALJ erred in finding that BP has a less than marked limitation in the domain of attending to and completing tasks. Dkt. No. 6 at 21-22. Defendant argues that the record supports the ALJ's finding that BP has a less than marked limitation in this domain. Dkt. No. 12 at 22-23.

The domain of attending and completing tasks considers how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them. 20 C.F.R. § 416.926a(h).

The ALJ found that BP has a less than marked limitation in this domain. (Tr. 20). For the following reasons, the ALJ's finding is supported by substantial evidence.

First, BP's school records support the ALJ's finding. In a questionnaire evaluating the functional domains, Mrs. Roberts, BP's kindergarten teacher, indicated that BP has no problems in his abilities to sustain attention during play/sports, wait to take turns, and change from one activity to another without being disruptive. (Tr. 95). She also indicated that BP has slight problems in his abilities to pay attention when spoken to directly, refocus to task when necessary, carry out single-step instructions, organize own things or school materials, and complete class/homework assignments. *Id.*

14

On October 7, 2005, BP's first-grade teacher, Mrs. Johnson commented that BP "works hard and is a very cooperative classmate." (Tr. 154). She also indicated that BP contributes positively to class, accepts responsibility, stays on task, and exhibits courtesy and self-control. *Id.*

Second, Dr. Schuessler's progress notes support the ALJ's finding. As noted, on November 11, 2003, BP's treating pediatrician, Dr. Schuessler, noted that Parker is "pleased" by the progress made by BP, who was taking Ritalin, and that she sees "good functioning" by BP. (Tr. 133).

On January 23, 2004, Dr. Schuessler noted that BP's ADHD is "apparently reasonably well controlled" when BP took Ritalin. (Tr. 132).

On February 20, 2004, Dr. Schuessler indicated in a questionnaire that BP's fine/gross motor skills, sensory abilities, communication skills, and cognitive skills are age-appropriate. (Tr. 130). He also noted that BP's functioning improves when he takes Ritalin. (Tr. 129).

On April 22, 2004, Dr. Schuessler noted that Parker reported a "dramatic improvement in [BP's] functioning with current med[ications]. All parties pleased. No change requested." (Tr. 127). Dr. Schuessler opined that BP is "doing reasonably well" with regard to his ADHD, ODD, and sleep problems. *Id.*

On December 21, 2004 Dr. Schuessler noted that BP, who was taking Clonidine, is "doing well." (Tr. 149).

On May 18, 2005, Dr. Schuessler noted that BP is taking Ritalin and Clonidine and is "apparent[ly] doing well at school." (Tr. 151). Dr. Schuessler commented that BP is "doing well" with regard to his ADHD, and that BP's sleep problems improved. *Id.*

On October 7, 2005, Dr. Schuessler commented that BP is "doing fairly well" with

15

regard to his ADHD and sleep problems.  (Tr. 181).

Third, the ALJ's finding is further supported by the opinions of the State agency physicians, Drs. Bostic and Dr. Dambrochia, who indicated that BP has a less than marked limitation in the domain of attending and completing tasks.  (Tr. 121).  As noted, State agency physicians are "highly qualified physicians . . . who are also experts in Social Security disability evaluation."  20 C.F.R. §§ 404.1527(f)(2)(I); 416.927(f)(2)(i); SSR 96-6p, 1996 WL 362203, at *2.

In light of the foregoing, the ALJ's determination in the domain of attending and completing tasks is supported by substantial evidence.

### 3. **Moving About and Manipulating Objects**

Parker argues that BP has a "serious" limitation in this domain.  Dkt. No. 6 at 23-24.  Defendant argues that the record supports the ALJ's finding that BP has no limitation in this domain.  Dkt. No. 12 at 24.

The domain of moving about and manipulating objects considers gross and fine motor skills, meaning how you move your body from one place to another and how you move and manipulate things.  20 C.F.R. § 416.926a(j).  The ALJ found that BP has no limitation in this domain.  (Tr. 20).  Based on the following, the ALJ's determination is supported by substantial evidence.

First, the school records support the ALJ's finding.  BP's teacher, Mrs. Roberts, indicated that BP has no problem moving his body from one place to another (e.g., standing, balancing, shifting weight, bending, kneeling, crouching, walking, running, jumping, and climbing).  (Tr. 97).  Moreover, in December of 2003, Mrs. Roberts noted that BP showed improvement in printing his name and in his small motor skills.  (Tr. 168).

Second, Dr. Schuessler's opinion also supports the ALJ's finding.  Dr. Schuessler

16

noted that BP's fine/gross motor skills are age-appropriate. (Tr. 130).

Third, the State agency physicians, Drs. Bostic and Dr. Dambrochia, indicated that BP has no limitation in this domain. (Tr. 122). As noted, State agency physicians are "highly qualified physicians . . . who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(I); 416.927(f)(2)(i); SSR 96-6p, 1996 WL 362203, at *2.

For the foregoing reasons, the ALJ's determination in the domain of moving about and manipulating objects is supported by substantial evidence.[4]

## VI. Conclusion

After careful review of the entire record, and for the reasons stated, this court finds that the ALJ erred by failing to discuss specifically whether BP's condition met or medically equaled Listing 112.05E. Accordingly, the ALJ's decision is reversed and remanded.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits is **REVERSED** and **REMANDED to consider whether BP's condition met or medically equaled Listing 112.05E.**; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**.

**IT IS SO ORDERED**.

Dated: October 7, 2008
       Albany, New York

*Gary L. Sharpe*
Gary L. Sharpe
U.S. District Judge

---

[4] There is no dispute regarding the ALJ's finding that BP has a marked limitation in the domain of interacting and relating with others. Dkt. No. 6 at 22-23; Dkt. No. 12 at 23-24.